**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Misc. Case No. 1:22-mc-20214**

| | |
|---|---|
| GRANT HOUSE, SEDONA PRINCE, AND TYMIR OLIVER,<br><br>                      Petitioners,<br><br>   v.<br><br>FLORIDA INTERNATIONAL UNIVERSITY,<br><br>                    Respondent. | CASE IN OTHER COURT:<br>*In re Student Athlete NIL Litigation,* Case No. 4:20-cv-03919-CW (N.D. Cal.) |

**PLAINTIFFS' MOTION TO COMPEL COMPLIANCE WITH A RULE 45 SUBPOENA, OR, IN THE ALTERNATIVE, TO TRANSFER THE MOTION**

**Table of Contents**

I.   BACKGROUND ....................................................................................................... 2

     A.   The Underlying Litigation.................................................................................. 2

     B.   The Subpoena.................................................................................................... 4

II.  ARGUMENT ............................................................................................................ 5

     A.   Legal Standard ................................................................................................. 5

     B.   The Subpoenaed Documents Are Relevant and Necessary to the Litigation ......... 6

          i.    NIL Agreements or Data.......................................................................... 6

          ii.   Squad Lists.......................................................................................... 10

          iii.  Financial Aid Summary Reports............................................................. 13

          iv.   Athletics Commercial Agreements ......................................................... 14

III. IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER PLAINTIFFS'
     MOTION TO THE NORTHERN DISTRICT OF CALIFORNIA................................ 16

     A.   Plaintiffs' Motion Should Be Adjudicated in the Northern District of California,
          Which Has the Best Understanding of the Complex Issues Involved in This Action
          .................................................................................................................... 17

     B.   The Northern District of California Should Rule on Similar Motions.................. 18

     C.   Transferring This Motion Would Impose No Burden on FIU.............................. 19

IV.  CONCLUSION........................................................................................................ 20

<u>**Table of Authorities**</u>

**Cases**                                                                                                **Page(s)**

*ADP, LLC v. Ultimate Software Grp., Inc.*,
   No. 17–cv–61272–DMM, 2017 WL 7794274 (S.D. Fla. July 26, 2017)............................ 5

*In re Braden*,
   344 F. Supp. 3d 83 (D.D.C. 2018) .................................................................................. 18

*Chem-Aqua, Inc. v. Nalco Co.*,
   No. 3:14–mc–71–D–BN, 2014 WL 2645999 (N.D. Tex. June 13, 2014)........................... 19

*In re Coll. Athlete NIL Litig.*,
   No. 4:20-cv-03919-CW (N.D. Cal.)............................................................................... 3, 17

*Cont'l Auto. Sys. U.S., Inc. v. Omron Auto. Elecs., Inc.*,
   No. 14 C 3731, 2014 WL 2808984 (N.D. Ill. June 20, 2014) ........................................... 17

*Dig. Shape Techs., Inc. v. Glassdoor, Inc.*,
   No. 16–mc–80150-JSC, 2016 WL 5930275 (N.D. Cal. Oct. 12, 2016).............................. 11

*Exist, Inc. v. Shoreline Wear, Inc.*,
   No. 15–61917–mc, 2015 WL 13694080 (S.D. Fla. Oct. 16, 2015) ............................... 18, 20

*Fla. State Conf. of Branches & Youth Units of NAACP v. Lee*,
   No. 21–81824–mc, 2021 WL 4891300 (S.D. Fla. Oct. 19, 2021)....................................... 6

*Global Music Rights, LLC v. Saga Commc'ns, Inc.*,
   No. 1:21–MC–00063-JPC, 2021 WL 4751184 (N.D. Ohio Oct. 8, 2021).......................... 18

*Gold Coast Prop. Mgmt., Inc. v. Valley Forge Ins. Co.*,
   No. 09–60029–Civ., 2010 WL 9871643 (S.D. Fla. Jan. 26, 2010)..................................... 11

*Google, Inc. v. Digital Citizens All.*,
   No. 15–mc–00707-JEB-DAR, 2015 WL 4930979 (D.D.C. July 31, 2015)......................... 19

*Hoog v. PetroQuest, LLC*,
   338 F.R.D. 515 (S.D. Fla. 2021)................................................................................. 17, 18

*N. Am. Transp. Servs., LLC v. Ryder Truck Rental, Inc.*,
   No. 21–mc–21911, 2021 WL 3290627 (S.D. Fla. Aug. 2, 2021)............................ 5, 6, 9, 11

*In re Nat'l Collegiate Athletic Ass'n Grant-in-Aid Cap Antitrust Litig.*,
   Case No. 4:14-md-2541-CW (N.D. Cal.)........................................................................... 9

*Nat'l Collegiate Athletic Ass'n v. Alston*,
   141 S. Ct. 2141 (2021)............................................................................................... 12, 16

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
311 F.R.D. 532 (N.D. Cal. 2015) ................................................................. 13

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
958 F.3d 1239 (9th Cir. 2020), *aff'd*, 141 S. Ct. 2141 (2021) .............................. 7

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
No. 09–cv–01967-CW, 2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) ............................... 12

*In re Niaspan Antitrust Litig.*,
No. 15–cv–1208-JKB, 2015 WL 3407543 (D. Md. May 26, 2015) ................................. 18

*Sullivan v. Personalized Media Commc'ns, LLC*,
No. 16–mc–80183-MEJ, 2016 WL 5109994 (N.D. Cal. Sept. 21, 2016) ........................... 6

*The Dispatch Printing Co. v. Zuckerman*,
No. 16–cv–80037, 2016 WL 335753 (S.D. Fla. Jan. 27, 2016) ..............................18, 20

*TIC Park Ctr. 9, LLC v. Cabot*,
No. 16–cv–24569, 2017 WL 3099317 (S.D. Fla. Apr. 12, 2017) ................................ 9

*VirnetX, Inc. v. Apple Inc.*,
No. 13–mc–80769, 2013 WL 12108440 (S.D. Fla. Sept. 26, 2013), *report and
recommendation adopted*, 2013 WL 12108441 (S.D. Fla. Nov. 18, 2013) ....................... 19

*Walgreen Co. v. Wyeth, Inc.*,
No. 19–mc–60417, 2019 WL 2406338 (S.D. Fla. Mar. 26, 2019) ..............................17, 18

*Wultz v. Bank of China, Ltd.*,
304 F.R.D. 38 (D.D.C. 2014) ................................................................. 20

*In re Zantac (Ranitidine) Prods. Liab. Litig.*,
No. 20–md–2924, 2020 WL 5585137 (S.D. Fla. Sept. 16, 2020) ................................. 6

**Statutes**

20 U.S.C. § 1232g, CFR Part 99 .......................................................*passim*

**Other Authorities**

Alexandra Pecharich, *Compensation for Student-Athletes? Everything You Need
to Know about 'NIL'*, FIUNEWS.COM (July 26, 2021),
https://news.fiu.edu/2021/big-bucks-for-student-athletes-everything-you-need-
to-know-about-nil-compensation ..........................................................2, 8

Complete Solutions for Name, Image, & Likeness, INFLCR, *available at*
https://www.inflcr.com/solutions/
compliance-staff/ ........................................................................... 8

David Drucker, *University Agrees to New Deal With Adidas*, PANTHERNOW.COM (Jan. 8, 2015), https://panthernow.com/2015/01/08/university-agrees-to-new-deal-with-adidas/ .................................................................................................. 4

Eric Henry et al., *Underdog Dynasty's Staff Discusses the First Week of the NIL Era*, UNDERDOGDYNASTY.COM (July 8, 2021), https://www.underdogdynasty.com/2021/7/8/22559877/name-image-likeness-college-athletics-g5-cavinder-twins-dillon-gabriel-malik-willis-carson-strong ..................... 2

Fed. R. Civ. P. 26(b) ......................................................................................... 5

Fed. R. Civ. P. 34 ........................................................................................ 1, 5

Fed. R. Civ. P. 37 ............................................................................................ 1

Fed. R. Civ. P. 45 ................................................................................... *passim*

*FIU Athletics Launches "ROAR" Name, Image and Likeness Program in Partnership with INFLCR*, FIUSPORTS.COM (Nov. 3, 2021), https://fiusports.com/news/2021/11/3/general-fiu-athletics-launches-roar-name-image-and-likeness-program-in-partnership-with-inflcr.aspx ...................................... 3

*FIU Athletics Sign $2.6 Million Deal With Adidas*, BOXSCORENEWS.COM (Jan. 5, 2015) https://boxscorenews.com/fiu-athletics-signs-million-deal-with-adidas-p110617-68.htm ................................................................................................. 4

*Florida International University Sports Information*, COLLEGEFACTUAL.COM (accessed Jan. 15, 2021), https://www.collegefactual.com/colleges/florida-international-university/student-life/sports/#:~:text=FIU%20brought%20in%20%2414%2C200%2C561%20in,paying%20out%20%2411%2C771%2C431%20in%20expenses .................................... 2, 3

Loc. R. 26.1(g) ................................................................................................. 1

NCAA Division I Manual, *available at* https://www.ncaapublications.com/p-4605-2020-2021-ncaa-division-i-manual.aspx ...................................................... 10

*Richard Gibson, From JUCO Transfer to FIU Panther: The Story of Tyrese Chambers, PANTHERNOW.COM (Oct. 20, 2021), https://panthernow.com/2021/10/20/from-juco-transfer-to-fiu-panther-the-story-of-tyrese-chambers/* .......................................................................................... 2

*Student-Athlete Name, Image, and Likeness, FIU.EDU, https://policies.fiu.edu/files/929.pdf* .................................................................. 6

In accordance with Rules 34, 37, and 45 of the Federal Rules of Civil Procedure and Rule 26.1(g) of the Local Rules of the Southern District of Florida, Petitioners Grant House, Sedona Prince, and Tymir Oliver ("Plaintiffs") hereby move to compel nonparty Florida International University ("FIU") to comply with a properly served subpoena seeking the production of documents, dated September 21, 2021, or, in the alternative, to transfer this Motion to the Northern District of California, where the underlying litigation is pending.

## MEMORANDUM OF LAW

Petitioners are college athletes asserting antitrust challenges to current and former National Collegiate Athletic Association ("NCAA") rules prohibiting them from benefiting financially from their names, images, or likenesses ("NIL"). On July 1, 2021, the NCAA suspended certain of these restrictions, allowing athletes to commercialize their NILs in limited circumstances. Since July, many college athletes, including FIU's athletes, have earned or been offered compensation through endorsement, sponsorship, or other NIL licensing deals.

Respondent FIU, while a nonparty to the litigation, is an NCAA member school and a party to, and beneficiary of, the challenged agreements to restrain trade. It is in possession of crucial discoverable information that cannot be obtained through other means. FIU has refused to engage in meaningful, good-faith negotiations and has not produced any information in response to Plaintiffs' subpoena. But Plaintiffs seek here to compel production of only four categories of documents: (1) documents or data relating to endorsement, sponsorship, or other NIL licensing agreements entered into by FIU athletes and disclosed to FIU under state law and university policy; (2) team "Squad Lists" that NCAA member schools are required to generate annually in accordance with NCAA rules; (3) corresponding financial aid summary reports; and (4) FIU's athletics-related media, sponsorship, and similar contracts. Plaintiffs limit their Motion to these categories because the responsive materials are readily identifiable, because they are highly relevant to Plaintiffs' claims, and because Plaintiffs have agreed through negotiations with many other NCAA member schools (including many of FIU's peer universities in Conference USA, and the other conferences) to limit their productions to these four categories.

There is no special reason why FIU should not make the same requested production. If anything, there are special reasons why FIU's records *should* be produced: FIU's athletics department reportedly generated $31 million in 2020,[1] largely because of the efforts of, and value derived from, its athletes. And within days of the NCAA allowing college athletes to commercialize their NILs, a group of FIU athletes signed agreements with a South Florida-based sports agency for NIL representation, and another announced a deal with a popular restaurant.[2] These realities go to the heart of the underlying litigation, including Plaintiffs' damages calculations, class-certification requirements under the Federal Rules of Civil Procedure, and the continued popularity of college sports when the athlete participants are allowed to commercialize their NILs.

As described below, the requested information is proportional to the needs of the litigation. It is vital to Plaintiffs' ability to prove their claims, and production would impose no undue burden on FIU, which is a direct participant in, and beneficiary of, the challenged NCAA rules.

## I.   BACKGROUND

### A.   The Underlying Litigation

Plaintiffs filed the underlying federal antitrust class-action lawsuit against the NCAA and its five most prominent member conferences (the ACC, Big Ten, Big Twelve, Pac-12, and SEC), alleging that Defendants, together with their member schools, have agreed to adopt national rules

---

[1] *Florida International University Sports Information*, COLLEGEFACTUAL.COM (accessed Jan. 15, 2021), https://www.collegefactual.com/colleges/florida-international-university/student-life/sports/#:~:text=FIU%20brought%20in%20%2414%2C200%2C561%20in,paying%20out%20%2411%2C771%2C431%20in%20expenses.

[2] Eric Henry et al., *Underdog Dynasty's Staff Discusses the First Week of the NIL Era*, UNDERDOGDYNASTY.COM (July 8, 2021), https://www.underdogdynasty.com/2021/7/8/22559877/name-image-likeness-college-athletics-g5-cavinder-twins-dillon-gabriel-malik-willis-carson-strong; Alexandra Pecharich, *Compensation for Student-Athletes? Everything You Need to Know about 'NIL'*, FIUNEWS.COM (July 26, 2021), https://news.fiu.edu/2021/big-bucks-for-student-athletes-everything-you-need-to-know-about-nil-compensation; Richard Gibson, *From JUCO Transfer to FIU Panther: The Story of Tyrese Chambers*, PANTHERNOW.COM (Oct. 20, 2021), https://panthernow.com/2021/10/20/from-juco-transfer-to-fiu-panther-the-story-of-tyrese-chambers/.

2

and restrictions to limit college athletes' abilities to earn compensation in exchange for their NIL rights. FIU has been a member of Conference USA since 2013 and a member of the NCAA for over five decades. At class certification, Plaintiffs will seek to represent four putative injunctive-relief and damages classes and subclasses, consisting of current and former college athletes. *See* Consol. Am. Compl. ¶¶ 300–05, ECF No. 164[3] (attached as Ex. 1).

The NCAA's current bylaws, rules, and regulations prohibit FIU and all NCAA Division I ("D-I") schools from directly or indirectly providing compensation to college athletes in exchange for the athletes' NIL rights. *Id.* ¶ 23. For decades, NCAA rules also prohibited athletes from receiving NIL-related compensation from *any* source, including from third parties unaffiliated with NCAA member schools. *Id.* ¶¶ 97, 100–04. On July 1, 2021, the NCAA announced a temporary policy suspending some of its NIL rules and permitted athletes to receive compensation from third parties for their NILs and subject to several limitations. *Id.* ¶ 22.

The period since July 1 has proven to be a natural economic experiment. Thousands of athletes have seized the newly permissible NIL opportunities, demonstrating the immense demand for college athletes' NILs. FIU's athletes are no exception. And FIU has boasted about its ability to enhance athletes' NIL-related earning potential, announcing on November 3, 2021, that FIU had launched its "ROAR" program to help athletes build and monetize their personal brands.[4]

Nonetheless, FIU was, and continues to be, a direct participant and beneficiary of the illegal restraints at issue. The FIU Panthers play fourteen NCAA D-I sports, and FIU's athletic department earned more than $31 million in revenues last year.[5] The efforts of, and value derived from, FIU's athletes directly contribute to these revenues. For example, in 2015, FIU signed a five-year deal with Adidas reportedly worth $2.6 million—an amount that more than doubled its

---

[3] Unless noted otherwise, docket citations refer to docket entries in *In re College Athlete NIL Litigation*, No. 4:20-md-03919-CW (N.D. Cal.).

[4] *FIU Athletics Launches "ROAR" Name, Image and Likeness Program in Partnership with INFLCR*, FIUSPORTS.COM (Nov. 3, 2021), https://fiusports.com/news/2021/11/3/general-fiu-athletics-launches-roar-name-image-and-likeness-program-in-partnership-with-inflcr.aspx.

[5] *See supra* n.1.

previous agreement with Adidas.[6]  Under this agreement, FIU receives substantial remuneration in exchange for requiring its athletes to wear Adidas apparel during all competitions, and Adidas reaps the benefits of associating its products with FIU's athletes.  The athletes, however, earn nothing from the arrangement because NCAA rules continue to prohibit it.

### B.    The Subpoena

Plaintiffs served the subpoena (attached as Exhibit 2) on FIU on September 21, 2021, with twelve relevant document requests.  Attached to the subpoena, Plaintiffs provided copies of the protective orders governing the production of confidential documents in the underlying litigation—orders that have protected some of the most highly confidential and valuable commercial agreements in college sports.  *See* Ex. 2 at Attachment B.  Plaintiffs also attached a sample notice for FIU to inform athletes affected by the subpoena that FIU would be producing certain information in accordance with the Family Educational Rights and Privacy Act. 20 U.S.C. § 1232g; 34 CFR Part 99 ("FERPA").  *See* Ex. 2 at Attachment C.

On October 8, 2021, FIU provided standard-form objections, including general objections that the subpoena was overbroad in scope; that much of the responsive information would be nonpublic, sensitive, confidential, proprietary, and/or trade secrets; that the requests sought information protected by federal and state privacy laws; and that the method of and time for compliance imposed an undue burden.  *See* Objections of Non-Party, FIU Board of Trustees, to Subpoena Issued by Plaintiffs (attached as Ex. 3).   During a telephonic meet-and-confer on November 19, and through email correspondence, Plaintiffs substantially narrowed their request—and the burden on FIU—to the four categories sought here: (1) documents reflecting FIU athletes' NIL agreements, or data of the same; (2) Squad Lists; (3) financial aid summary reports; and

---

[6]  David Drucker, *University Agrees to New Deal With Adidas*, Panthernow.com (Jan. 8, 2015), https://panthernow.com/2015/01/08/university-agrees-to-new-deal-with-adidas/; *FIU Athletics Sign $2.6 Million Deal With Adidas*, BoxScoreNews.com (Jan. 5, 2015) https://boxscorenews.com/fiu-athletics-signs-million-deal-with-adidas-p110617-68.htm. Plaintiffs believe that this agreement has been extended through at least the 2021-2022 NCAA athletic season.

(4) commercial agreements entered into by FIU's athletics department. Plaintiffs explained to FIU that the requested materials are critical to properly defining Plaintiffs' classes, proving antitrust injury, and developing reliable damages models. Plaintiffs offered to compromise further and limit their requests to Requests 1, 2, and 4, but FIU refused to engage in a substantive conversation, and on December 16, 2021, stated that it would continue to stand on its original objections. *See* Email from M. Lines to A. Dale & J. Wexler (Dec. 16, 2021) (attached as Ex. 4). To date, FIU has not produced any documents in response to the subpoena, nor provided any confirmation that it intends to do so.[7]

## II.   ARGUMENT

The Court should order FIU to produce the requested materials. Their production is proportional to the needs of the underlying litigation, as the documents are highly relevant to the claims and defenses, the requests are tailored to minimize any burden on FIU, and the information is unavailable from any other source.

### A.   Legal Standard

"The Federal Rules of Civil Procedure favor an expansive scope of discovery," including with respect to a Rule 45 nonparty subpoena. *N. Am. Transp. Servs., LLC v. Ryder Truck Rental, Inc.*, 2021 WL 3290627, at *2 (S.D. Fla. Aug. 2, 2021). Indeed, a Rule 45 subpoena "has the same scope of discovery allowed under Rules 26(b) and 34," which allow "discovery regarding any non-privileged matter that is relevant . . . and proportional to the needs of the case[.]" *Id.* (quoting Fed. R. Civ. P. 26(b)(1)). Proportionality contemplates the importance of the issues, the amount in controversy, the parties' resources, the importance of the discovery, and whether the burden or expense of the proposed discovery outweighs its likely benefit. *See* Fed. R. Civ. P. 26(b)(1); *see also, e.g.*, *ADP, LLC v. Ultimate Software Grp., Inc.*, 2017 WL 7794274, at *2 (S.D. Fla. July 26, 2017) (ordering discovery where "it is not unduly burdensome to ask a [nonparty] to search certain

---

[7] At the November 19 meet-and-confer, counsel for FIU stated that the school would be willing to produce a limited set of already-public documents, responsive to subpoena Requests 6, 7, 9, and 11. *See* Email from J. Wexler to M. Lines (Nov. 22, 2021) (attached as Ex. 5), at 3.

employees' emails on a specific subject matter"); *Sullivan v. Personalized Media Commc'ns, LLC*, 2016 WL 5109994, at *2–3 (N.D. Cal. Sept. 21, 2016).

A party seeking nonparty discovery "must take reasonable steps to avoid imposing undue burden or expense." *Ryder*, 2021 WL 3290627, at *2 (quoting Fed. R. Civ. P. 45).  While status as a nonparty may be considered in determining whether the burden imposed by the subpoena is undue, it is not dispositive.  *Fla. State Conf. of Branches & Youth Units of NAACP v. Lee*, 2021 WL 4891300, at *2–3 (S.D. Fla. Oct. 19, 2021) (rejecting argument that "information sought in Plaintiffs' subpoenas is not relevant to the underlying case because [respondent] is not a party to that case").  A "party objecting to discovery based on undue burden bears the burden of persuasion on that objection."  *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 2020 WL 5585137, at *3 (S.D. Fla. Sept. 16, 2020); *accord Ryder*, 2021 WL 3290627, at *2.

**B.    The Subpoenaed Documents Are Relevant and Necessary to the Litigation**

**i.    NIL Agreements or Data**

In response to subpoena Request No. 4, Plaintiffs seek, for the period from July 1, 2021, through the end of the 2021–2022 academic year, NIL agreements that athletes disclosed to FIU in accordance with state law and FIU,[8] or data about those agreements.[9]

FIU's objections are as follows:

(i) the request seeks documents protected from disclosure by federal and state privacy laws; (ii) the request is overly broad in scope; (iii) the request is unduly burdensome; (iv) the request seeks the disclosure of documents that should be first obtained directly from one of the parties in the case without burdening a non-party with the time and expense of production; (v) the Subpoena places an undue burden on the University due to (a) the notification requirements under FERPA and (b) the large number of student records at issue; (vi) the request is unreasonable in terms of the time frame for compliance due to (a) the large number of records requested, (b) the notification

---

[8] FIU's NIL policy requires that "FIU student-athletes must disclose any NIL contract or opportunity through the reporting system established by FIU within five (5) business days." *Student-Athlete Name, Image, and Likeness*, FIU.EDU, https://policies.fiu.edu/files/929.pdf.

[9] Plaintiffs offered to substantially narrow the original subpoena request to this limited category of documents after FIU's objections regarding breadth and burden.  *Compare* Ex. 2, Subpoena Request 4, *with* Ex. 5, at 1–2.

requirements under FERPA and (c) the burdensomeness of the request; and (vii) the request seeks sensitive, non-public, confidential, proprietary and/or trade secret financial information.

Ex. 3, at 6; Ex. 4.

This data regarding student-athletes' NIL agreements goes to the heart of the underlying litigation, as Plaintiffs allege that the NCAA's national rules that limit—and until July 1, entirely prohibited—athletes' abilities to enter into NIL agreements violate the antitrust laws. These agreements (or data therefrom) show that the NCAA's rules suppress—and until July 1, entirely eliminated—a robust market for college athletes' NIL rights. There can be no more-pertinent evidence in an antitrust lawsuit than a natural experiment of the market without some of the challenged restraints. *See In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1250, 1258 (9th Cir. 2020) (affirming district court injunction against certain NCAA compensation limits based, in part, on "two natural experiments" of athletes' receipt of compensation above NCAA limits), *aff'd*, 141 S. Ct. 2141 (2021). The NIL agreements Plaintiffs seek embody that natural experiment, and for that reason alone, they should be produced.

Separately, details about the NIL agreements are essential for Plaintiffs to develop damages models that will reliably predict which athletes, or categories of athletes, would have entered into such agreements in the past if the challenged NCAA rules were not in effect, and how much the athletes would have received. According to public reports, FIU athletes quickly began taking advantage of these opportunities. For example, a group of FIU athletes signed agreements with a South Florida-based sports agency for NIL-related representation. And another announced a deal with a popular restaurant and a massage gun company.[10] Indeed, FIU itself has boasted about the NIL earning opportunities available to its athletes. Just weeks after the NCAA eliminated some of its NIL-related rules, FIU posted an article on its website discussing the changed policy and prominently displaying an image of an FIU athlete's NIL "Partnership Announcement" with a

---

[10] *See supra* n.2.

popular restaurant.[11]   And, on November 3, when FIU announced its "ROAR" program—in partnership with marketing company INFLCR[12]—to assist athletes in building their NIL brands, FIU's Executive Director of Sport and Entertainment said:

> It is important for us to both educate and support our student-athletes throughout the process, which is why we have partnered with INFLCR, the industry-leader in the self-branding space. Their innovative platform will help our student-athletes maximize their NIL opportunities and serve as a launching pad for their future success.[13]

Plaintiffs seek details about FIU athletes' NIL agreements that are specific to FIU and maintained by FIU in the normal course of business. Per FIU policy effective July 1, 2021, athletes are required to disclose their NIL-agreement details to FIU through the school-designated platform,[14] likely INFLCR.[15]   This information is not maintained by any Defendant.   Nor is it available publicly.   The burden that Plaintiffs would face in independently collecting each agreement entered by a FIU athlete is substantial.   By contrast, there would be little to no burden on FIU to produce the requested information, as it can be easily downloaded from the school-designated platform.   FIU is thus the *only* reasonable custodian of this essential information.

Although FIU has declined to engage in material discussions to elaborate on its boilerplate objections, none has merit.   Plaintiffs have substantially narrowed the documents they seek to only the NIL agreements or data maintained in the school-designated platform detailing those agreements.[16]   This is a limited universe of documents, as NIL deals have only been permitted

---

[11] Alexandra Pecharich, *Compensation for Student-Athletes? Everything You Need to Know about 'NIL'*, FIUNEWS.COM (July 26, 2021), https://news.fiu.edu/2021/big-bucks-for-student-athletes-everything-you-need-to-know-about-nil-compensation.

[12] INFLCR is one of several companies providing technology that universities may provide to their student-athletes to assist them in tracking NIL opportunities and agreements.   *See* Complete Solutions for Name, Image, & Likeness, INFLCR, *available at* https://www.inflcr.com/solutions/compliance-staff/.

[13] *See supra* n.4.

[14] *See supra* n.8.

[15] *See supra* n.4.

[16] *See supra* n.9.

under NCAA rules since July 1, 2021.  To the extent FIU has confidentiality concerns, there is a comprehensive protective order in the underlying litigation, which was attached to the subpoena and has effectively protected the most highly confidential commercial agreements in all of college sports.  *See, e.g.*, *In re Nat'l Collegiate Athletic Ass'n Grant-in-Aid Cap Antitrust Litig.*, Case No. 4:14-md-2541-CW, Dkt. Nos. 1111–13 (retaining under seal nonpublic portions of multibillion-dollar NCAA multimedia agreement and highly valuable sponsorship licensing agreements).

Similarly, while FERPA prohibits the everyday disclosure of students' personal information, such information may be produced in response to a lawful subpoena where the affected students are notified in advance and provided an opportunity to object to disclosure.  20 U.S.C. § 1232g(b)(2)(B); 34 CFR § 99.31(a)(9)(ii). [17]  The burden of issuing FERPA notices regarding this request is minimal.  FIU undoubtedly maintains accessible contact information to allow it to communicate easily with its students.  FIU must provide notice only to those athletes who have received and reported compensation for their NILs since July 1, 2021.

In short, NIL agreements are direct evidence of the effect of the challenged NCAA rules. Accordingly, because of FIU's unique possession of the NIL-deal information for its athletes and the minimal burden required to produce that information, the request is proportionate to the needs of the underlying litigation and should be compelled.  *See Ryder*, 2021 WL 3290627, at *2 (compelling nonparty to produce "discrete set" of information); *TIC Park Ctr. 9, LLC v. Cabot*, 2017 WL 3099317, at *3 (S.D. Fla. Apr. 12, 2017) (nonparty's "reliance on barebones claims of hardship is insufficient to meet the requirements of Rule 45").

---

[17] To Plaintiffs' knowledge, the issue of whether commercial agreements between athletes and third parties are subject to FERPA protections has not been adjudicated.  In any event, Plaintiffs do not object to FIU's issuing FERPA notices and providing athletes an opportunity to object if FIU believes it necessary.  Plaintiffs intend to honor any athlete objections to disclosure.

### ii.    Squad Lists

In response to subpoena Request No. 1, Plaintiffs seek, for the proposed class period from January 1, 2016, through the 2021–2022 academic school year, all "squad list forms" and "supplementary forms," as defined in the 2020–2021 NCAA Division I Manual, Bylaw 15.5.11.2,[18] prepared by FIU for its D-I sports teams ("Squad Lists").  Ex. 2, at 6.  NCAA rules require schools, including FIU, to prepare and maintain Squad Lists for each of their D-I athletic teams and to make them "available for examination upon request by an authorized representative of another member institution, the NCAA, and, if the institution is a member of a conference, an authorized representative of the conference."  NCAA Bylaw 15.5.11.2 et seq.  These Squad Lists detail each team member's name and NCAA eligibility data, including his or her class year and the amount of athletic and total financial aid received.  *Id.*  In other words, a Squad List contains a compilation of material information about the student-athlete team members.

FIU objected to producing Squad Lists, based on the following grounds:

> (i) the request seeks documents protected from disclosure by federal and state privacy laws; (ii) the request is overly broad in scope; (iii) the request is overly broad in time frame; (iv) the request is unduly burdensome; (v) the request purports to require the creation of documents or the providing of "information"; (vi) the request seeks the disclosure of documents that should be first obtained directly from one of the parties in the case without burdening a non-party with the time and expense of production; (vii) the Subpoena places an undue burden on the University due to (a) the notification requirements under FERPA and (b) the large number of student records at issue; (viii) the request is unreasonable in terms of the time frame for compliance due to (a) the large number of records requested, (b) the notification requirements under FERPA and (c) the burdensomeness of the request.

Ex. 3, at 3–4; Ex. 4.

Plaintiffs believe that FIU stores its Squad Lists in an easily accessible central repository, but Plaintiffs offered to discuss particular burden concerns associated with producing them.  Yet FIU has refused to meaningfully engage.  *See* Ex. 4, at 1–3.  Because Squad Lists are readily

---

[18] *See* 2020–2021 NCAA Division I Manual, *available at* https://www.ncaapublications.com/p-4605-2020-2021-ncaa-division-i-manual.aspx.

available for production and highly relevant to the underlying antitrust litigation, FIU should be compelled to undertake the minimal burden required to produce them.

The compiled information maintained in Squad Lists is critical data for at least three reasons: Plaintiffs will use the data to (1) develop their damages model; (2) address class definition issues; and (3) demonstrate that all class members were harmed.

In support of their damages claims, Plaintiffs' experts will develop economic-regression models to predict which athletes would have received NIL compensation in the but-for world. Plaintiffs expect to match financial-aid and player-identification data in Squad Lists to real-world attributes (which Plaintiffs will independently collect)—such as on-field performance, social media presence, pre-enrollment notoriety, and local and national popularity—to create "player profiles" that may serve as inputs into the regression model. For the 2021–2022 natural-experiment year, this "player profile" will also include the NIL-agreement data discussed above. Courts regularly compel third parties to produce materials relevant to a party's damages claims. *See, e.g.*, *Ryder*, 2021 WL 3290627, at *2, *4; *Gold Coast Prop. Mgmt., Inc. v. Valley Forge Ins. Co.*, 2010 WL 9871643, at *1, *3, *6 (S.D. Fla. Jan. 26, 2010) (requiring nonparty to produce "categories of documents relating . . . to Plaintiff's claim for hurricane damage"); *Dig. Shape Techs., Inc. v. Glassdoor, Inc.*, 2016 WL 5930275, at *2, *5 (N.D. Cal. Oct. 12, 2016) (compelling nonparty to produce "documents responsive to [certain] requests to support [plaintiffs'] damages claim" and "relevant to the question of damages").

Plaintiffs will also use Squad List data to respond to Defendants' "substitution effect" argument—the theory that in the but-for world, where the challenged NIL rules did not exist, more-talented athletes would attend college in the first place, or stay in school longer, which, in turn, would displace less talented athletes from the class. This argument contends that less-talented athletes benefit from the challenged NIL restraints and thus cannot be part of the proposed classes. Plaintiffs will analyze financial-aid and roster information in Squad Lists to address this argument and the class definitions to support their position that no class member would have been displaced in the but-for world, even under Defendants' substitution-effect theory.

The substitution-effect argument is not hypothetical—Defendants already advanced it in their Answers.  For example, the NCAA's Eleventh Additional Defense states, "The claims of the Plaintiffs and alleged members of the putative class and sub-classes are barred, in whole or in part, *to the extent that they were not injured by, or have been enriched by, the rules being challenged here . . . .*"  Def. NCAA's Answer, ECF No. 170, at 51 (emphasis added) (attached as Ex. 6). Further, plaintiffs in prior antitrust litigations against the NCAA and conference Defendants have addressed the same arguments, illustrating the relevance of the Squad Lists.

In the *O'Bannon* antitrust litigation challenging the NCAA's prohibition on college athletes' abilities to "enter[] into group licensing arrangements with videogame developers and broadcasters for the use of their names, likenesses, and images," the court declined to certify certain of the proposed plaintiffs' classes based on the NCAA's substitution-effect arguments. *See In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 2013 WL 5979327, at *8–9 (N.D. Cal. Nov. 8, 2013) (observing that a "barrier to manageability here is the so-called 'substitution effect'").  In the more recent *Alston* litigation, plaintiffs rebutted a similar argument through an expert analysis of Squad List data showing the distribution of financial aid among student-athletes. *In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig.*, 311 F.R.D. 532, 542–43 (N.D. Cal. 2015) (crediting plaintiffs' experts' analysis of Squad Lists and financial-aid data to reject substitution-effects arguments).  Critically, the *Alston* plaintiffs' ability to analyze Squad Lists stands in stark contrast to the *O'Bannon* class-certification denial when the plaintiffs did not obtain that data and could not provide the court with more-extensive analyses of the proposed classes, as Plaintiffs anticipate they will do here.[19]  Accordingly, Squad Lists are highly relevant and should be produced for that reason alone.

---

[19] The proposed classes in *O'Bannon* and *Alston* share certain attributes with the proposed classes in the underlying litigation but are also distinguishable in several ways—an issue that may be further considered by the Northern District of California during the class-certification process. This action is also being prosecuted following the Supreme Court's landmark decision in *Alston*, which made clear that compensation restraints imposed by the NCAA and its members are fully subject to antitrust scrutiny, which also may bear on the class-certification and damages issues here.  *See Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2156–57 (2021).

Although FIU has largely declined to engage in substantive discussions during the parties' meet-and-confers, Plaintiffs understand that the burden of issuing FERPA notices is FIU's primary objection to producing Squad Lists.  As noted above, FERPA permits the disclosure of otherwise-protected information in response to a lawful subpoena where the affected students are notified in advance and provided an opportunity to object.[20]  Plaintiffs believe that, like other universities, FIU maintains an accessible repository of current and former students' contact information and, like other universities, FIU routinely sends mass mailings to far more current and former students than those impacted by the subpoena.  It is thus no surprise that in response to similar subpoenas, dozens of colleges and universities—including institutions in Florida—have issued FERPA notices and produced, or will soon produce, Squad Lists.

In sum, compelling FIU to produce Squad Lists is proportional to the needs of the underlying case.  They are created and maintained by FIU in the normal course of business, are highly relevant to the underlying litigation, and would impose minimal burden on the well-resourced FIU Athletics Department.

### iii.    Financial Aid Summary Reports

In response to subpoena Request No. 2, Plaintiffs ask that the Court order FIU to produce (or consent to the NCAA producing), for the period from January 1, 2016, through the 2021–2022 academic year, "Student-Athlete Financial Aid Summary Reports" from the NCAA's Compliance Assistant database, which FIU submits annually.  These reports contain additional details on team-member financial aid.

Although Plaintiffs offered this substantially narrowed request,[21] FIU continues to stand on its original objections:

---

[20] Plaintiffs do not dispute that FERPA protects some data in Squad Lists, and Plaintiffs will not pursue such information about any athlete who objects through the FERPA process.

[21] *Compare* Ex. 2, Subpoena Request 2, *with* Ex. 4, at 1–3.

(i) the request seeks documents protected from disclosure by federal and state privacy laws; (ii) the request is overly broad in scope; (iii) the request is overly broad in time frame; (iv) the request is unduly burdensome; (v) the request purports to require the creation of documents or the providing of "information"; (vi) the request seeks the disclosure of documents that should be first obtained directly from one of the parties in the case without burdening a non-party with the time and expense of production; (vii) the Subpoena places an undue burden on the University due to (a) the notification requirements under FERPA and (b) the large number of student records at issue; (viii) the request is unreasonable in terms of the time frame for compliance due to (a) the large number of records requested, (b) the notification requirements under FERPA and (c) the burdensomeness of the request; and (ix) the request seeks sensitive, non-public, confidential, proprietary and/or trade secret financial information.

Ex. 3, at 4–5; Ex. 4.

This financial-aid data—which is complementary to, and more comprehensive than, the information in Squad Lists—provides unique insight into the status of the current and former athletes. As described above, Plaintiffs will use this information in tandem with Squad List information to build and test their damages models, address the scope of the class definitions, and address Defendants' substitution-effect argument. There is no additional burden to FIU in producing this data, as athletes can be notified through the same FERPA notice issued by FIU with respect to Plaintiffs' prior requests, and upon completion of the FERPA process, FIU can simply authorize the NCAA to make the production.

### iv.   Athletics Commercial Agreements

Plaintiffs seek to compel FIU to produce, for the period from January 1, 2016, through the present, (1) any media, sponsorship, licensing, or other revenue-generating commercial agreements entered into by FIU relating to its D-I sports, including apparel and equipment contracts, sponsorship contracts, multimedia-rights contracts, and contracts licensing the broadcast of FIU's D-I athletics events; and (2) FIU's agreement or agreements with Opendorse.[22]  Plaintiffs

---

[22] In an effort to avoid the need for court intervention, Plaintiffs offered to drop this request entirely if FIU agreed to produce Squad Lists, Financial Aid Summary Reports, and documents reflecting NIL agreements. *See* Ex. 5, at 1.  FIU declined to substantively respond to the offer, Ex. 4, at 1, and Plaintiffs therefore seek production of these highly relevant commercial agreements.

are also amenable to the Court's setting a materiality threshold, allowing FIU to withhold any revenue-generating commercial agreements valued at less than, e.g., $10,000.

> FIU objects to this Request on the following grounds:
>
> (i) the request is overly broad in scope; (ii) the request is overly broad in time frame; (iii) the request is unduly burdensome; (iv) the request seeks the disclosure of documents that should be first obtained directly from one of the parties in the case without burdening a non-party with the time and expense of production; and (v) the request seeks sensitive, non-public, confidential, proprietary and/or trade secret financial information.

Ex. 3, at 8; Ex. 4.

FIU's commercial agreements are directly relevant to the claims and the defenses in the underlying litigation. Indeed, they illustrate the monopsony profits that NCAA schools derive, at least in part, from the use of athletes' NILs. For example, under FIU's reported apparel deal with Adidas, FIU requires its athletes to wear Adidas apparel during all competitions, and Adidas reaps the benefits of associating its products with FIU's athletes. The athletes, however, receive no compensation from the agreement. These agreements also reflect the value that FIU's commercial partners place on athletes' NIL rights—information that goes to the heart of Plaintiffs' claims. And according to Plaintiffs' review of similar agreements, FIU's commercial agreements are likely to explicitly or implicitly grant FIU's commercial partners the rights to use FIU athletes' NILs. Finally, Defendants have repeatedly asserted that a principal justification for their compensation-related rules (including the challenged NIL rules) is that college sports are distinct from professional sports and that fans consume college sports because of their "amateur" nature. Plaintiffs are entitled to test that claim by reviewing the terms of the commercial agreements to determine how much (if at all) those documents show any connection between consumer interest in FIU D-I athletics and players' not receiving NIL compensation, rather than loyalty and interest in FIU for other reasons.

These commercial agreements are unique to FIU and could not readily be obtained from another party. It would be substantially more burdensome for Plaintiffs to identify each of FIU's commercial partners and seek production of the agreements from them piecemeal while FIU is

likely to have them segregated in a central location.  Nor are Plaintiffs aware of any publicly available repository containing this targeted information absent making a public records request, which would result in substantially the same or greater burden of production for FIU.[23]  And to address any confidentiality concerns associated with producing these agreements, Plaintiffs provided FIU with the operative protective orders in the underlying litigation.  As noted above, these orders have effectively protected from disclosure the most-lucrative and highly confidential commercial agreements in all of college sports, and similar confidential agreements—many worth billions of dollars—have been produced without issue in this litigation.

In short, FIU's commercial agreements are highly relevant to the underlying litigation, including as evidence of precisely how FIU itself generates monopsony profits as a result of the challenged NCAA rules.  The agreements will be adequately concealed from public disclosure and are likely maintained by FIU in a central repository in the normal course of its business.  The minimal burden required for FIU to collect and produce them is therefore proportionate to the needs of the underlying litigation.

## III.   IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER PLAINTIFFS' MOTION TO THE NORTHERN DISTRICT OF CALIFORNIA

Finally, in the alternative, this Motion should be transferred to the Northern District of California for adjudication because it arises from complex litigation pending there.  *See In re Coll. Athlete NIL Litig.*, Case No. 4:20-cv-03919-CW (N.D. Cal.).  "When the court where compliance is required did not issue the subpoena, it may transfer a motion under this rule to the issuing court . . . if the court finds exceptional circumstances."  Fed. R. Civ. P. 45(f).  The phrase "exceptional circumstances" has been broadly interpreted.  *See* Fed. R. Civ. P. 45(f) Advisory Comm. Notes (2013 Amendment).  Courts weighing transfer under Rule 45(f) "should look to a variety of factors to determine if the judge from the issuing court is in a better position to rule on the motion due to

---

[23] Although FIU indicated at the November 19 meet-and-confer that it would be willing to produce athletics-related agreements which are subject to public records request disclosure (which it has not done), it stated that it would not produce responsive documents maintained by its private affiliate, the Panther Athletic Fund.

her familiarity with the full scope of the issues involved as well as any implications the resolution of the motion will have on the underlying litigation." *Hoog v. PetroQuest, LLC*, 338 F.R.D. 515, 517–19 (S.D. Fla. 2021) (citation omitted).  Those "factors include the complexity, procedural posture, duration of pendency, and the nature of the issues pending before, or already resolved by, the issuing court in the underlying litigation." *Id.* (citation omitted); *see also Walgreen Co. v. Wyeth, Inc.*, 2019 WL 2406338, at *2 (S.D. Fla. Mar. 26, 2019).

Given that the Northern District of California already has the best understanding of the issues involved in this complex class action (issues that directly implicate the requests at the heart of Plaintiffs' Motion), the importance of avoiding inconsistent rulings, and minimal (if any) burden on FIU to litigate this matter in the Northern District of California, exceptional circumstances exist, and this Court should transfer Plaintiffs' Motion to that district.

### A.   Plaintiffs' Motion Should Be Adjudicated in the Northern District of California, Which Has the Best Understanding of the Complex Issues Involved in This Action

Courts should grant motions to transfer where the litigation is complex and doing so is necessary "to avoid disrupting the issuing court's management of the underlying litigation." *See* Fed. R. Civ. P. 45(f) Advisory Comm. Notes (2013 Amendment).  Here, the Northern District of California is in the best position to adjudicate the objections raised by FIU—which, as described above, relate to the merits of the underlying litigation—and provide consistent rulings on similar discovery disputes without disrupting the underlying case.  *See Walgreen*, 2019 WL 2406338, at *2 (noting that the transferor court's "resolution of debates about relevance . . . [and] matters entrusted to the substantial discretion of trial courts [] would run the risk of being inconsistent with the [issuing court's] management of the voluminous discovery in this lawsuit"); *Cont'l Auto. Sys. U.S., Inc. v. Omron Auto. Elecs., Inc.*, 2014 WL 2808984, at *2 (N.D. Ill. June 20, 2014) (transferring motion to compel nonparty document production to avoid "disrupting [the issuing] court's management of the underlying litigation" where relevance objections to a subpoena required the court to "delv[e] into the merits of the litigation").  The issuing court remains the best

forum for resolution of such questions even where it "has not yet ruled on any discovery disputes." *In re Braden*, 344 F. Supp. 3d 83, 94 n.9 (D.D.C. 2018); *accord Exist, Inc. v. Shoreline Wear, Inc.*, 2015 WL 13694080, at *3 (S.D. Fla. Oct. 16, 2015) (finding exceptional circumstances given the "potential for disruption in the underlying litigation caused by potentially conflicting rulings").

The Northern District of California—specifically, Judge Claudia Wilken and Magistrate Judge Nathanael Cousins, who are presiding over the underlying litigation—is particularly familiar with the materials that lie at the heart of Plaintiffs' Motion to Compel. Indeed, Judges Wilken and Cousins presided over two prior antitrust lawsuits concerning NCAA compensation limits. Those experiences, including Judge Wilken's intimate familiarity with the substitution-effect argument raised—and decided differently—in each case, demonstrate that the Northern District of California has "developed a deep and rigorous understanding of the issues implicated in [this] dispute," making transfer appropriate. *Global Music Rights, LLC v. Saga Commc'ns, Inc.*, 2021 WL 4751184, at *3 (N.D. Ohio Oct. 8, 2021) (internal citations and quotations omitted); *accord Hoog*, 338 F.R.D. at 517–18 (presiding judge is "better positioned to determine issues of relevancy . . . and other related issues in light of her close involvement in the [underlying] litigation and her knowledge of the issues at play in the complex case before her" where the underlying litigation had "a complex history and is related to several cases that have been filed in the [presiding district] involving highly specialized . . . class action claims").

**B.    The Northern District of California Should Rule on Similar Motions**

Exceptional circumstances requiring transfer are also present where, as here, "the issuing court is already coordinating discovery in the underlying multidistrict action [and] that court has already issued subpoenas to entities in various other states." *In re Niaspan Antitrust Litig.*, 2015 WL 3407543, at *1 (D. Md. May 26, 2015); *see also* Fed. R. Civ. P. 45(f) Advisory Comm. Notes (2013 Amendment) ("[T]ransfer may be warranted . . . [where] the same issues are likely to arise in discovery in many districts."); *The Dispatch Printing Co. v. Zuckerman*, 2016 WL 335753, at *3–4 (S.D. Fla. Jan. 27, 2016) (granting transfer given the "demonstrable risk of inconsistent

discovery rulings" where plaintiff "will continue to subpoena th[e] same type of information from [nonparties in] various judicial districts").

Plaintiffs have served more than 100 subpoenas on colleges and universities in dozens of judicial districts.  While Plaintiffs have reached agreements with most of these NCAA member schools, similar motions to compel and transfer are likely to become necessary in other judicial districts.[24]  Transfer will therefore preserve the Northern District of California's authority over its proceedings and promote judicial economy by ensuring consistent subpoena compliance.  *See VirnetX, Inc. v. Apple Inc.*, 2013 WL 12108440, at *3 (S.D. Fla. Sept. 26, 2013), *report and recommendation adopted*, 2013 WL 12108441 (S.D. Fla. Nov. 18, 2013) (transfer appropriate where "virtually identical subpoenas . . . and motions to transfer are pending in three different districts" and "denying transfer in this District while the other districts with pending motions may or may not do the same would only add to the confusion and complexity of the underlying litigation"); *Google, Inc. v. Digital Citizens All.*, 2015 WL 4930979, at *3 (D.D.C. July 31, 2015) (granting motion to transfer because similar motions to compel and transfer pending in multiple jurisdictions "create[d] potential for inconsistent rulings" and "weigh[ed] in favor of a single judicial officer deciding all . . . disputes").

### C.    Transferring This Motion Would Impose No Burden on FIU

 Transfer will impose minimal, if any, burden on FIU.  Even if counsel for FIU were required to appear in person for any oral argument (which is uncertain given the prevalence of remote hearings occurring across the country in light of the COVID-19 pandemic), transfer would still be appropriate because "the fact that the subpoenaed party and its counsel are [] located [outside] the issuing district" does not "weigh decisively against transfer to the issuing court in the face of other exceptional circumstances favoring transfer." *Chem-Aqua, Inc. v. Nalco Co.*, 2014 WL 2645999, at *4 (N.D. Tex. June 13, 2014).  Nor will FIU be required to incur any

---

[24] Plaintiffs have already filed a similar Motion to Compel or Transfer in this district against the University of Miami, which is represented by the same counsel as FIU.  *See* Case No. 1:22-mc-20194 (S.D. Fla.).

additional expense to litigate in the Northern District of California. *See Exist, Inc. v. Shoreline Wear, Inc.*, 2015 WL 13694080, at \*3 (S.D. Fla. Oct. 16, 2015) (minimal burden associated with transfer to California in part because "the Advisory Committee notes to Rule 45 encourage the court to permit telephonic participation after transfer to minimize travel costs to non-parties"). Indeed, "[t]ransferring a *motion* to the jurisdiction where the underlying litigation is pending that will require few, if any, modifications of the written submissions, does not rise to the level of unfair prejudice. Therefore, the cost that may be incurred to litigate a motion in the [issuing district] . . . is *de minimis*." *Wultz v. Bank of China, Ltd.*, 304 F.R.D. 38, 45 (D.D.C. 2014) (emphasis in original); *accord Dispatch Printing*, 2016 WL 335753, at \*4 (transferring motion after finding transfer would not "impose an undue burden that would have the effect of canceling out the exceptional circumstances weighing heavily in favor of transfer").

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court compel FIU's compliance with the subpoena or, in the alternative, grant Plaintiffs' Motion to Transfer.

\*  \*  \*  \*  \*

**CERTIFICATE OF GOOD FAITH CONFERENCE; CONFERRED BUT UNABLE TO RESOLVE ISSUES PRESENTED IN THE MOTION**

In accordance with Local Rule 7.1(a)(3)(A), I hereby certify that counsel for the movant has conferred with all parties or nonparties who may be affected by the relief sought in this Motion in a good-faith effort to resolve the issues, but has been unable to do so.

Respectfully submitted,

By:  s/ *Cristina I. Calvar*
Cristina I. Calvar (Fla. Bar No. 114201)
Adam I. Dale (*pro hac vice* forthcoming)
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
ccalvar@winston.com
aidale@wisnton.com

Jeanifer E. Parsigian (*pro hac vice* forthcoming)
**WINSTON & STRAWN LLP**
101 California Street
San Francisco, CA 94111-5840
Telephone: (415) 591-1000
Facsimile: (415) 591-14000
jparsigian@winston.com

*Counsel for Petitioners*

21

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2022, a true and correct copy of Plaintiffs' Motion to Compel Compliance with a Rule 45 Subpoena or, in the Alternative, to Transfer the Motion, with Exhibits 1 – 6 and Civil Cover Sheet thereto, was served via e-mail and United States Postal Service first-class mail on:

Eric D. Isicoff
Matthew L. Lines
ISICOFF RAGATZ
601 Brickell Key Drive, Suite 750
Miami, Florida 33131
Telephone: (305) 373-3232
Facsimile: (305) 373-3233
E-mail: isicoff@irlaw.com
E-mail: lines@irlaw.com

*Attorneys for nonparty*
*Florida International University*

/s/ Cristina I. Calvar
Cristina I. Calvar

22